May it please the court. This case I think is going to turn on the resolution of issues 2, 3, and 4 from my brief. So with the court's permission, I'll go ahead and start with issue 2, which is the improper exclusion of Dr. David Lay, Mr. Arthur's retained expert in this case. Principally, the problem with this here is that at trial it was stipulated to, and let me back up a little bit here. So the Miller test is going to feature prominently in my argument. The Miller test is itself not a test for obscenity, it is a test for statutes which purport to criminalize obscenity. And in this case, 18 U.S.C. 1462 and 1466a import the Miller test. So I'll be talking about prongs of the Miller test, but really these are part and parcel of the statutes. So the first two prongs of the Miller test were actually stipulated to by Mr. Arthur. In this case, there was no doubt that the images and stories that we're talking about appealed to a prurient interest in sex or depicted sexual conduct in a patently offensive manner. Did you try this case? Were you the trial attorney? That is true. I was one of the two attorneys who tried this case, Your Honor. So you're not arguing those to us whether they were stipulated to or not? That is correct. You're not arguing them on appeal? I'm not arguing them on appeal. Because I question your recollection of your own work in terms of whether those were stipulated to. But go ahead. Principally, what I want to focus on though is the third prong of the Miller test, and this is particularly important when we're talking about Dr. Lay because Dr. Lay was the first to do the third prong of the Miller test, which unlike the first two prongs is an objective inquiry. And the objective inquiry here is whether the challenge works lack significant artistic, literary, scientific, political value, what we can call Miller value. In particular, Dr. Lay brought with him and was going to use these exhibits at trial comparable images and comparable stories, and he was going to talk about the use of erotic art and erotic stories in his clinical practice. So it's more the scientific value therapeutically, and that's what he's trained to do, right? That was what Dr. Lay... Less the artistic, literary side, or you want to argue both? No, I'm going to argue all of those, Your Honor. Dr. Lay obviously as a clinical psychologist uses them in terms of scientific value for part of his treatment, but Dr. Lay was also an author of several books. He is a historian of art, erotic art. He is a historian of erotic literature. He is familiar with those as well. One of the things that featured in the district court's decision, of course, was the idea that Dr. Lay was there to testify to these three areas, and that seemed a bit broad for one person. But again, kind of dovetailing into the first issue that I had in my brief, it was very necessary for Dr. Lay to have that broad base of experience. This was the one expert that could come in and sort of testify to all of these things. And Rule 702 in the Daubert standard do not require that Dr. Lay have specific training in those areas. He doesn't have to have a PhD in art history for the history of erotic art to be germane to his practice and what he has studied and what he has written on it. The government did file a motion to exclude him under Daubert, and it was just carried with the case until day one of the trial? That is true, Your Honor. And you're up against a tough standard of review. We review for manifest error, and that's been defined as error that's indisputable and contrary to any law. And the judge made fairly thorough reasons for his ruling. I would agree that the judge counsel was very thorough in his ruling. However, a lot of his rationale came from cases like Paris Adult Theater I from the And Paris Adult Theater I focuses primarily on the first two prongs of the Miller test, not the third prong, not the objective prong. So part of the judge counsel's reasoning in rejecting Dr. Lay's expertise is that he was no better qualified than the average juror to make these sorts of determinations. And as regards something like the second prong of the Miller test, that is absolutely correct. Applying contemporary community standards, does the artwork taken as a whole depict sexually explicit conduct in a patently offensive manner? That is something that you, me, the average juror, anyone can make that determination just as good as anyone else. But that's not the case with the third prong of the Miller test. The third prong of the Miller test. This is very helpful, but I have two questions I'm going to interrupt you with. What is, in light of Judge Davis's questions, high standard? What's your best Fifth Circuit case about where we do reverse for manifest error, number one? And what's your best case in the context of 1462-66 or Miller obscenity at all? Very good, Your Honor. I was not able to find a Fifth Circuit case, nor did I cite one in my brief where this court had reversed for manifestly erroneous error in a Daubert context. If the court would like, I would be happy to do some additional research and submit one in a post-submission brief for the court. Now with regard to my best case that I was able to find, I believe that comes from Justice Gregory's concurrence and dissent in the Worley case from the Fourth Circuit. In particular, I think that, and this kind of goes into my second and third issues as well, which I think are related, because again, had Dr. Lay been able to testify, I think we may have seen a different result with regard to the images and the stories. So in Worley, in particular Justice Gregory's concurrence and dissent, we're looking there at his . . . You're not arguing Miller third prong as to the two cartoons in the drawing. You're not just making the argument that the statute has to be understood to be real minors rather than . . . Is that correct? That is correct, yes. Okay. I am making that argument as well, but I do think that obscenity is something more . . . So we've got to do an independent de novo review? Is that unequivocal under the law? We've got to look at every single one of these counts, look at the underlying material, and does it qualify for Miller third prong, correct? Yes. Absolutely. Okay. And do you accept that you're in the world of manifest error, or because it was your only expert in defense, are you making a due process argument that your complete defense was taken from you? No, Your Honor. We're not making a due process argument that the complete defense was taken from us. Obviously we were able to put on a defense . . . I found a case from the D.C. District Court that was pretty close to this case, where the question was . . . let's see, the case is the U.S. v. Stagliano, and so the psychologist testified very similar to what Dr. Lay was going to testify to, that he thought letting the patients read the obscene material would make them feel better about themselves and improve their condition, and so on cross-examination, he admitted that he knew of nobody who had ever done that, and there wasn't any literature on it, so the judge said, this is just a theory that's never been tested, so why isn't that . . . what happened here? Well, actually Dr. Lay spoke to that during the hearing. He testified as to the methodology and the scientific basis behind his reasoning on that, provided the court with some additional information, and I don't . . . I apologize to the court, I did not find this case in my research, so I don't know if it is more recent or less recent than the research that Dr. Lay has been doing on the subject, but Dr. Lay did talk about how the use of material, erotic art and material, could be used, and he had actually used it in his treatment of people with these parothelias, and said that this was something that was commonly accepted in the clinical psychological community. It was using approved methods. We're not looking at revolutionary science here. This is something that is settled and evidence-based and accepted there. The district court found that there was a disconnect between that and the use of erotic art, erotic stories, and the challenge material, because the challenge material specifically described the abuse of babies and young children, but I think that's a distinction without a difference as to whether it can be used in this context in such a way that would assist a clinical psychologist in either identifying a specific parothelia that they're trying to treat, maybe reducing some of the shame, maybe allowing the person to be more forthcoming and talk about it, because it's kind of like, you know, one of those 12-step things. The first step is that you have to admit there is a problem, and so unless the clinician can get to the root of the problem, they can talk to the person and find out where they are going wrong in terms of their relation to sexuality, they can't really begin to treat them offhand. You stipulated to prongs one and two, and then Dr. Lay is excluded. Just give me a quick reminder of what your defense became. Who tried to speak to the jury about counterintuitive therapeutic value? So that was brought up during cross-examination of government's witnesses. Okay. What was your expert going to testify to? I read his letter, but it's so long, and there's so much of it, I couldn't, wasn't sure of my interpretation of it. What was he going to help the jury on? So one of the things that he would be able to help the jury on was the comparable material. So for example, all throughout my argument in points three and four, I talk about some of the comparable material that anyone can go and find in any bookstore or library or video store in the United States of America. Jurors, because this is an objective inquiry, it requires a reasonable person standard more so than what the average juror might understand. More so, I think I likened it to the use of an expert in a negligence case talking about the standard of care. That's a ripe area for expert testimony because the average juror may never have read Lolita. The average juror may never have read Tropic of Cancer. They may never have seen American Beauty or the Saw films or any of these other materials which are commonplace, commonly viewed, not challenged as obscene, but widely available. But when you say not challenged as obscene, ever tested, and I'm thinking particularly Marquis de Sade, that really, those stories looked to me indistinguishable from this stuff. But I guess you could have a state prosecutor somewhere that would decide to describe Marquis de Sade, 120 Days in Solemn as obscenity. And they have in the past. Oh, they have? That's been litigated? Pre-Miller, yes. And so post-Miller, that's never been litigated, and of course, the 120 Days of Sodom, which I would agree with, Your Honor, they are very similar to the stories in- I thought he would probably, might testify that creators of this type of literature or whatever you call it, are not inevitably violent criminals. And that is very true, and one of the things that became a prominent feature during the trial was that there were a number of people that were picked out whether the users of the Mr. Double website were themselves criminal. And there were a few of them that were picked out that had been convicted of child pornography or other offenses. But the vast majority of the people who used it, and this was something I think brought out during cross-examination, had never had any criminal charges at all. And so one of the- I meant to ask you that under, I guess I'll ask the government, under 1462, which criminalizes receipt or transporting, there are 2,000 authors here, correct? Somewhere in that number, yes, quite a few. Those folks unequivocally are transporting. When you say users, do you mean them or do you mean the 2 million people that accessed it, who therefore arguably received it? I think either of them could face criminal liability. Either of those groups could face criminal liability under these statutes. And that sort of dovetails into a larger point, particularly about text-only obscenity. And my argument there is that we have had a long history in this country and in England before that regarding prohibition of text-only obscenity. But the trend has been, particularly through the 20th century, and especially in post-1973, after Miller, that text-only obscenity is less subject to regulation than visual depictions. Okay. Trends and less subject to are difficult. And I think I'm right, you didn't file a reply brief. I did not file a reply brief. Your client's basically in jail on a life sentence. That is correct. So giving us answers to the government's arguments would really help. So I'm going to ask you four quick ones. Very good. When you say there's a trend away from text-only, do you concede that the government's correct, that the Supreme Court has said text-only can equal Miller? I do concede that. That's the very point.  That's the very mechanism of the United States Department of Justice. If it can be done, according to the Supreme Court, I agree there may be a declining trend that may be because child pornography is what they're going after, or war. Okay. So you concede that. Second question. You are emphasizing, and I'm not being critical, these are just important questions to me. You emphasize your expert wanted to introduce comparables, but do you agree with the government's citation to case law that courts don't commit reversible error when they exclude comparables? Because the jury is supposed to just look at the materials themselves. I would not concede that. I think that that goes more to the second prong and the jury being able to decide according to their community standards. Okay, I agree. Third, just because time. Do you agree that courts have said the government doesn't commit error if it doesn't offer an expert as to any of the prongs? I would agree with that, yes. And then last one is they cite PASSEM. That means a lot. Our Ragsdale decision, but you haven't yet had an opportunity to speak to it. Do you think it's relevant to this appeal? I do think the Ragsdale decision is relevant, but if the Ragsdale case dealt with visual depictions, videos of simulated rapes, and I think that videos are different than cartoons and drawings and text, and so that would be my argument distinguishing those. Let me just ask you this. I mean, Dr. Lay had a scientific background, so to me the strongest argument is that he could offer some, that the material had scientific value, but has there ever been a case where a psychologist has been allowed to testify on a literature issue, compare literature? I was unable to find a case specifically on that, but I don't think that there is anything in 702 or Darbert that says that a clinical scientist could not, so long as that scientist were shown to have the relevant experience above and beyond what a juror would have necessary to speak to the issue, and I don't think that there's any question that Dr. Lay is kind of a renaissance man as an author of books himself that are not purely scientific. Some of his books are, you know, pop psychology, they are talking about art, they are talking about things outside the realm purely of clinical psychology, and I see that I've exceeded my time. Thank you. Thank you, sir. Ms. Adams? May it please the Court, Anne O'Connell Adams for the United States. The jury properly found that Mr. Arthur had transmitted obscene visual depictions of minors engaging in sexually explicit conduct, that he'd used a computer to transmit obscene images, and that he was in the business of selling and transferring obscene matters. Sufficient evidence supports those convictions, and we think the Court should affirm. We can start with the expert testimony issue. The District Court has wide discretion in obscenity cases to allow experts to testify or not to allow them to testify. The Supreme Court has said that in Hamling, and this Court has said that as well. Counsel, are you familiar with any Miller obscenity conviction that's been affirmed when the defense was not allowed any defense expert as to Miller prompts? Can you name me a single circuit case in this country where the defense was denied any expert testimony? Again, the Silva case from the First Circuit that we cite in our brief, there the defense tried to put on an English professor to testify about, you know, photos and films and things like that involving interaction between adults and children in sexual activity, and the Court excluded it, finding that it would not be— And therefore, the defense had no expert in Silva? I believe that's correct. Okay. Because you remember, and I read that what startled me on page two of this trial is the includes Dr. Lay. Counsel says, we might want to confer with our client. Dr. Lay was, as the Court knows from our witness, our entire case. Court says, let's take 15 minutes. So on minutes before trial started, this defendant's entire case, and Miller defenses are utterly counterintuitive. It's vile and grotesque. It's completely counterintuitive. The premise behind Miller is that someone for the defendant is going to be able to explain to the jury why there's serious value. Do you agree with that description of what Miller's about? Well, no. I think what the Supreme Court has said repeatedly is that this is the type of—the obscenity question is the type of thing that a jury can figure out on its own. It doesn't need expert testimony to determine if something satisfies the Miller criteria, and the Supreme Court in Paris Adult Theater said this is not—it's not an error for— My understanding of the law, but I'll look really closely at Sylvia, is that that's always the government doesn't have to put an expert on. They can stand on the materials. They don't need comparable. I didn't find a single case where the defendant was told, you can't have anyone to explain Miller pronged three. I think sometimes—I mean, district courts do allow defense experts to testify, and if they're qualified and they have reliable methodology and their testimony would be helpful according to what the district court's determinations, then sometimes experts do testify. I think in the Ragsdale case that we cite repeatedly in our brief, there was a defense expert there. And his qualifications were identical. He was a sex therapist. Yes, but— Why isn't Ragsdale alone authority for reversing? He's got to have some—I mean, this guy was—correct me if I'm wrong—he was a Ph.D. in clinical psychology. Yes, he's a— He's a sex therapist with many years' experience. He's a clinical psychologist and a sex therapist. And that's exactly what was admitted. And in Ragsdale, the husband and wife had videos called real rape. And it's hard to explain that at all, but is there value? And so the sex therapist gets on. Maybe there's value. It's cathartic. I mean, the proffer suggests that we don't want these people to go find child pornography. We don't want them to assault anyone. And so maybe if they just express it in total fantasy grotesque fiction, there's some value. Could persuade the jury. May not. But here, he didn't even get his entire case in. So I think a couple of responses to that. First is that, you know, so Dr. Lay, the district court said on the first three categories, so political value, literary value, artistic value, he's not an expert in any of those things. He's only potentially talking about scientific value. And what he had to say there wasn't reliable. And it wouldn't be helpful for the jury. It wasn't. You mean his methodology wasn't reliable? Yes. The district court said that's because he hadn't done the research himself on which he based his opinions. That's reversible error, right? You can't. No, you would. Wait, wait, wait. Let me ask the question. You would say that a district court can properly exclude an expert if the expert based his opinion on other research others have done. That's your position? No. That's not my position. But I think here— But the district court said that. The district court said he had read some articles written by other people about the use of erotica and child pornography to treat people who are—to prevent them from contact offending against children. And he didn't do any of that research himself. He read a few articles on it. The court said that is not enough to make him an expert and testify about the likelihood that these type of materials would help somebody not contact offend against children and therefore have scientific value. And what the district court—you know, his testimony at the hearing and in the report that he submitted beforehand was equivocal on that point. It said it might help based on these articles that I've read. It might not. And so it's not even really helpful to the jury to determine the question that they're supposed to be answering, which is whether the material lacks serious artistic, scientific, political, or literary value. If he's saying it may or may not, then that's not even—even if there was like a modicum of helpfulness or scientific helpfulness to the material, it's not enough to satisfy the Miller test. And I think the other thing that's important— But you agree with the opposing counsel the only way he could even get any of his defense in was cross-examining your witnesses? Who did he try to say this has therapeutic value of? Well, there—I don't think any of our—that was what he limited his case to. He did have other experts go and look at these materials. So Dr. Lay was the one that they selected for trial. There were actually three experts that went and looked at the materials. I'm just asking at the trial, where did he get a chance to defend against Miller? On the internet with fiction? I don't know. I don't—it would have been through cross-examination of the government witnesses, but I can't off the top of my head think of— Did Dr. Lay confirm in that early hearing that he'd been qualified as an expert repeatedly? I believe he said he had. This was his first time potentially testifying in federal court, but he had been qualified as an expert before in civil court or in various other things. Did Dr. Lay say that he had never—in his treatment of pedophiles, he had never had anyone read material like this for the idea that it would help him? Yes. Did he also say that he had never heard of anybody using it in treatment? That's correct. That's another thing that the district court focused in on when determining that this wouldn't be helpful or that he wasn't qualified to speak on these types of materials, is that although Dr. Lay does—said that he does use erotica and pornography to treat clients, he doesn't use anything like this where it's literature about the rape and sexual abuse and torture and killing of babies and children. As Judge Davis said, he said he wasn't aware of any other doctor doing that either. The district court's opinion here, or the decision to exclude the testimony, is reviewed for abusive discretion. There has to be a manifest error, and the court was applying Rule 702, determining whether this expert was qualified to speak to the materials at issue in terms of whether they had serious scientific value, and the court said, I have no question that this would not be helpful to the jury and that it would confuse the jury. The district court has wide discretion in obscenity cases to allow or not to allow experts to testify. Okay. That statement again, what's your best authority for wide discretion when it's the defendant's only expert? Well, it's not like he was only given the choice to have one expert. The defense could list as many witnesses as it wants. You know he's got a separate issue, but the government's position was this material—it's very difficult, restricted access to the material for his other experts. Yes. Although three experts did come to look at it, three experts did view it. Dr. Lay was the expert that they selected, and you know, there are any number of things that the defense can say at trial. He picked this one expert witness and the witness was excluded. Yes. I don't think it's that unusual to have the hearing, you know, shortly before the trial or before the trial, and so I don't know that that should factor into the analysis at all, that just because the hearing was happening close to the trial that it became a manifest error for the judge to exclude it. The judge was just applying the test to determine . . . I forget the exact counts that correspond to the exhibits, but his argument is really, it is just a Pong three case as to the text only and the three, the two cartoons and the drawing. But we do have an independent duty review under Salcido, right? That's correct. So again, this prosecution would suggest that any real filth, S&M, infants, children, on the web, to my knowledge, could be a felony offense. This man gets 480 months. So I have a bunch of questions about limiting principles, and then I'd like you to focus on the facts since we've got to do it too. So drawing our attention to Exhibit 11A, the drawing, what features would you say, based on case law, show that that photo, that drawing was patently offensive? What features in the drawing? Can you tell me which, I've got the counts rather than . . . Exhibit 11A is the drawing of the adolescent girl who's naked. Okay. What features? Describe the features. I think the features would be it's a young girl masturbating, that it's listed next to text on the website. In Salcido, we said photo only, right? So we just, the jury would just look at the image for that count. Now don't jump to the text, which I know is a little story about a childhood friend, a locker room talk, vile, awful, and then he says it's not true. Just the photo. I'm asking you to describe, because we've got to do this review, what the features are. You said young girl masturbating. So is it the government's position that any drawing, this is not a real child, any drawing on the internet of an adolescent girl masturbating is felony obscenity? Yes. That's the government's position? Yes. And I think here, the jury certainly made that determination. No other features in that drawing? I think there's a reference to, it's been a while since I've looked at the drawing. I only looked at it one time, but that the girl looks scared as well, that she looks like she's not doing this on purpose or on her own volition, but perhaps at the instruction of somebody, is a part of how that drawing. My memory, and I have looked at it recently, and I'm glad that you have, because we do have an independent duty, my memory is it's a drawing, like a Durer drawing, Durer from six centuries ago, of a naked, Durer did infants, focused on genitalia, probably a real child. This is just a person's fantasy, little pen drawing of an adolescent girl reclined, touching herself. And the government's position, you've been clear, is that anywhere on the internet that that type of drawing exists, that's subject to prosecution 1462. Yes. Yes. Okay. So then, would your answer to the questions asked opposing counsel, all 2,000 of people who had these fantasies written, wrote them down, or drew them, or the 2 million people that accessed this drawing, those are all committing felony offenses? What makes it a crime is to transmit it over the internet, to send it through the mail, so yes, I mean, I don't know that anyone- And to receive it. Yes. And so people that click on it and see this drawing have received obscenity. All right. That's rather staggering. I mean, with child pornography, real victims were seeing aggressive prosecution of that. I did not know that the government interprets these two statutes that broadly. It would seem to me what that makes really important, you're from the obscenity, child obscenity unit, right? No, I'm from the main justice department. Okay. So my guess is, because obscenity prosecutions are very few, you're familiar with the Mapplethorpe case. Yes. Okay. And that was a photo of a real child, naked, focused on the genitalia. And the only reason he was acquitted is because he brought in 21 experts to try to tell the jury there's some value here. So what's the answer to Mr. Arthur? He gets no expert. There's a drawing of an adolescent girl masturbating. Your position is- Our position is we can give it to the jury. I mean, these are images that were, it's prohibited by the federal statute from sending them over the internet, from sending them through the mail, from receiving them over the internet. And Mr. Arthur was putting this stuff out there for, you know, in making a business out of it. And yes, if we can get the jury to look at the images, and you know, there were three particular images charged in this case, and then of course the five stories. But yes, I think a jury can definitely look at those things and determine under the Miller test that the image appeals to the prurient interest in sex, that it portrays sexual conduct in a patently offensive way, and that taken as a whole, it doesn't have any serious- So Mapplethorpe, famous artist again, a photographer. He takes a picture of a younger girl than that Exhibit 11A. It's a real girl. Mapplethorpe is guilty in spite of the jury verdict, or it just depends on the whim of the jury. And does the fellow get experts? No, I think that this is clearly under the Supreme Court's jurisprudence. The Miller test is defining material that's not protected by the First Amendment. The jury can decide it. These are questions that are, you know, that a jury can decide, and that the Supreme Court has said experts are not necessary for the jury to look at it and make those decisions by themselves. Experts can come in if they're qualified and if they meet the standards and can satisfy the district court that they're an expert in the subject, that they have a reliable methodology for determining whether these materials have scientific value or some other kind of value. If it's a literary value or an English professor, somebody that's wanting to testify. But, you know, yes, it's our position that if we put these images before a jury, we can let the jury decide. And then, of course, this court does an independent review for obscenity afterward. And I think that second part of the standard of review is built in to make sure that there's not, you know— We should do that as to each count, each picture, each text. We should do that. It's reserved. Yes. Yes, that is the court's jurisprudence that after the jury— No, but in this case, preserved, we have those issues before us. Yes. Relatedly, and you still have plenty of time, help me if I'm wrong, but I looked as hard as I could at all federal obscenity convictions. The Ragsdales, again, with a video that was debatedly a real child called Real Rape. That couple got 33 months. Mr. Arthur gets 480 months. Can you tell me any federal obscenity, not child pornography conviction, that gets even remotely near the life sentence that he got? I'm not sure of the sentence given in McCoy, but McCoy is another one that's extremely similar to this case. That was Mr. McCoy, Frank McCoy, actually was an author who submitted web stories to Mr. Arthur's website, and then he had his own website as well. He pled guilty. I believe that's correct. I think you could double check. I think those people are getting those months for probation. No, no, no. No, because an expert testified at his trial, and so no, he did not plead guilty. So he had an expert, okay, but you don't know offhand anyone that got hundreds and hundreds of months on obscenity alone? I don't think I can recall any of the sentences in the cases in particular since that's . . . Is there any minimum sentence for these cases? Excuse me? Is there a minimum sentence? No, the maximum for the way that the court did it in this case, the guidelines range actually started at 360 months, and the district . . . I know that, but there's no minimum sentence? No, no. Now, is it possible to say that this district court didn't base that sentence on the fact that the PSR had double hearsay anonymous accusers that said, oh, well, actually, Arthur really sexually assaulted me when I was a child? Doesn't it seem inevitable that that was what drove the sentence? I don't think so, and the district court specifically said that it was, you know, it was the guidelines range, and that wasn't included in the guidelines range. So, the descriptions of the FBI interviews with women who had been sexually abused by Arthur stated that . . . The claim that they had, never charged, never found. Yes, and that was . . . it was listed in a part of the PSR that was not relevant conduct, but it was . . . the probation office determined it was reliable after Mr. Arthur objected to it, and it was put into the PSR, but because it was listed as a part that was not relevant conduct, it wasn't included in the guidelines range. The probation officer was saying, you could use this based on the 3553A factors to go above the guidelines and, you know, to protect the community and based on his personal characteristics, and the district court said, no, I'm not doing that. I'm choosing a sentence of 480 months, which was toward the lower end of the guidelines range. You've been very accurate. I appreciate your candid answers. It's a difficult case for me, you can tell, but that is correct, and he said, regardless he would have gotten there, right? Yes, that's correct, and so yes, they weren't included in the guidelines range, and I think the suggestion that the consecutive sentences were done because of that information in the PSR I think is also incorrect just based on the record, the district court . . . As you finish, I guess you can see I'm looking for a limiting principle. Do you see one from doing these? Well, I think this court can provide it through the independent review. I think that's why this court's case law builds in the independent review. We don't have an expert to tell us this vile, grotesque stuff is therapeutic. We don't have that. He didn't. Yeah, well, I think you can look to . . . the best case on that I think is the McCoy case. That court was looking at things that were exactly the same as this case. McCoy was one of the authors that submitted things to Mr. . . . He was denied an expert? He had an expert. That's the problem. Okay. So, why do you say that's your best case, if you mind? Because this court in its independent review said this is exactly the type of hardcore pornography that's excluded from First Amendment protection. They were the exact same type of stories that were at issue in . . . We'll do it. It is our obligation, but we usually benefit from record material, expert opinions on scientific and therapeutic. The guy's a sex therapist. That's precisely the expert the defense got in the Ragsdale case. And I guess my final response to that is just that the Supreme Court and this court have said this is the type of thing that a jury can look at without expert assistance and he's got to make a showing that the expert meets the qualifications under Rule 702 and the district judge reasonably concluded here that this expert did not. Thank you. Why didn't you ask for a continuance? The minute your whole defense is gutted, why not ask for continuance if you had other experts that had looked at this? The other experts were from further away than Dr. Lay and would have been prohibitively expensive for Mr. Arthur to have them come out. Again, this was a case that took a long time to come to trial and I understand that was because of the pandemic. But during that time, Mr. Arthur was denied being released on bond. He could not be out working. He could not be earning additional money to assist in his own defense. He did not have family members who had a job or were working. He and his wife were estranged at the time. They've since reconciled, but at the time . . . He in or out? I assume he's been incarcerated pending the appeal? He has been incarcerated pending the appeal, yes. And so it would have been prohibitively expensive had this been a case where an that could have happened, but based on the exigencies and the trial level strategy decisions, primary counsel on the case, Mr. Bennett, determined to go ahead. So one thing that struck me during the government's argument that I think deserves some discussion here is their position that an obscenity prosecution can lie for any drawing similar to the one in Exhibit 11A or any story similar to any of the challenge stories. I think that if we look at Ashcroft v. Free Speech Coalition, it contemplates that there must be some material which falls between actual child pornography, which everyone agrees is constitutionally able to be forbidden possession or production of, and obscene material featuring children. There has to be something that they call the virtual child pornography, which is outside the realm of what the government can constitutionally regulate. And if the government's position is that, well, any sexual material featuring children that is not featuring real actual children and child pornography is then subject to an obscenity prosecution, that erases the holding of Ashcroft v. Free Speech Coalition. That the government there grants themselves the power to say, we can bring an obscenity prosecution, force someone to defend themselves against it in any jurisdiction in the United States, so long as we think that we can convince 12 jurors that this material lacks value and is therefore obscene. That would make it so that if I were a librarian and I heard that argument, I would go and I would pull every copy of 120 Days of Sodom off my library shelves. I would go and I would pull every copy of American Psycho. I would pull every copy of Lolita. I would pull every copy of Tropic of Cancer. I would pull every copy of Absalom Absalom, the color purple. I would take these off my shelves. The government emphasized that the limiting principle here with no expert is the three of us. We have to look at this and decide that third problem. So when I look at Exhibit 11A, for example, it's awkward to ask these questions, but do you recall that the drawing had a woman looking like she was fearful or someone? I do not. I do not recall the drawing having identifiable facial features. I recall it being a very simple, very crude, I described it after I first viewed it because Mr. Bennett was not able to come out to view it. I viewed it for the defense team personally as a line drawing. Very similar to like a charcoal drawing or sketch. It's not. Any teenager might draw it? Absolutely. I mean, it's a sketch. It's not a full featured thing. I don't even reclassify. Am I right, citing the Lol Salcido in particular, that when the image is charged, you look at the image only? You don't look at the text? You are correct on that. And one of the other things that I wanted to speak to on the text is the way that the website worked, and this was extensively testified to at the trial, is that these photographs did not accompany the stories. These photographs accompanied the author profile. So if you were on the website, you had to go from the story to the author profile to see the image. So there was no text accompanying the image itself anyway. The text was one of the stories that you could go to from the author profile, but you can't say specifically, well, this bit of text links up to this image, because that's not the way they were arranged on the site. So even if the government were right, and I do not concede that they are. I think that Your Honor is absolutely right. We look at the image itself, but even if the government were right, the connection between the story and the image is far too tenuous to support that, oh, well, this story is referring to this image. This was Netman 169's author profile photo, and I do think that it is way too crude to say that there were identifiable features the same way as in the other ones. I don't think that the identifiable features there directly speak to anything regarding whether it is obscene. They're highly stylized drawings. See that I'm out of time? I thank the Court for the argument. Thank you, sir.